# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**EDRA D BLIXSETH**,<br><br>　　　　　Debtor. | Case No. **09-60452-7** |
| **BEAU BLIXSETH** and **MORGAN BLIXSETH**,<br><br>　　　　　Plaintiffs.<br><br>-vs-<br><br>**EDRA D BLIXSETH**,<br><br>　　　　　Defendant. | Adv No. **10-00018** |

# MEMORANDUM of DECISION

At Butte in said District this 9th day of June, 2011.

Plaintiffs, through counsel, filed a Motion for Summary Judgment on May 11, 2011. Plaintiffs' Motion for Summary Judgment was accompanied by a Brief in support thereof, a Statement of Undisputed Facts and an Affidavit of attorney Mark R. Sandri. Plaintiffs argue the following are undisputed facts:

### STATEMENT OF UNCONTROVERTED FACTS

1.　Debtor, Edra Blixseth's bankruptcy case was filed on March 26, 2009 under Chapter 11 of the Bankruptcy Code.

1

2.  Debtor's case was converted from a Chapter 11 to a Chapter 7 by Order of this Court entered May 29, 2009.

3.  At all relevant times, Blixseth Family Investments, LLC ("BFI") was a Montana limited liability company formed on August 22, 2000 and governed by an Operating Agreement of the same date.

4.  At all relevant times, Plaintiffs, Beau and Morgan Blixseth, each owned a 10% interest in BFI. Debtor owned a 60% interest in BFI and served as its Managing Member.

5.  As a Managing Member of BFI, Debtor had fiduciary duties to all members, including Plaintiffs.

6.  At all relevant times, BFI's primary asset was a promissory note in the face amount of $35,650,000 ("the BFI Promissory Note").

7.  In November 2007, Debtor obtained an unsecured loan from First Bank in the amount of $5,000,0000.

8.  In March 2008, Debtor, as Managing Member of BFI and purportedly on behalf of BFI, obtained an $8,000,000 loan from First Bank. Debtor delivered the BFI Promissory Note to First Bank as security for the loan. BFI was the principal obligor on the loan.[1]

9.  Following the $8,000,000 loan from First Bank to BFI, BFI approved an $8,000,000 unsecured loan to Debtor. Debtor used $5,000,000 of the proceeds of this loan to pay off her unsecured $5,000,000 loan to First Bank.

---

[1] Plaintiffs assert at page 6, line 8 of their summary judgment brief that "[t]he documentation of the $8.0 million loan even refers to *Debtor as the borrower* of the loan." (Emphasis in original) The Court presumes the foregoing is a typographical error because if Debtor is the borrower, Plaintiffs' claim for relief must fail.

10. In January 2009, Debtor, as Managing Member of BFI and purportedly on behalf of BFI, obtained a twelve (12) month extension of the $8,000,000 loan from First Bank and an additional advance of $2,000,000. The loan documents reflect that the BFI Promissory Note continued to serve as collateral for the extension and additional advance. BFI was the principal obligor on the loan.

11. Plaintiffs did not receive notice of the transactions described in Paragraphs 8, 9 and 10. Debtor failed to provide notice to Plaintiffs for the transactions.

12. Neither BFI nor Plaintiffs received any benefit from [the] loan transactions described in Paragraphs 8, 9 and 10. The only member of BFI that received any benefit from the $8,000,000 loan and/or $2,000,000 additional advance was Debtor.

13. On August 6, 2009, BFI filed a claim in Debtor's bankruptcy in the amount of $10,749,095.89.

14. On February 24, 2011, First Bank filed a Complaint against BFI for Breach of Contract and Money Had and Received in the Superior Court of California. The Complaint relates to the loan transactions described in Paragraphs 8 and 10 and alleges damages in the amount of $11,515,762.64.

The Debtor/Defendant opposes Plaintiff's Motion and has filed a Memorandum in Support of Objection to Plaintiff's Motion for Summary Judgment along with an affidavit of the Debtor/Defendant and the following Statement of Disputed Facts:

## STATEMENT OF DISPUTED FACTS

8. At all times, Edra Blixseth was attempting to only take a loan out for her personal liability and securing it only by her 60% interest in BFI. When Ms. Blixseth became aware that

3

the $8,000,000 loan was taken out in the name of BFI and reportedly secured the entire interest of BFI in the subject note, she discussed the situation with the Bank officer, Mr. Rye. Mr. Rye stated to Edra Blixseth by telephone and in person that since the Dolan payments had not been made yet, if she increased the loan amount to $10,000,000 and put that whole amount on Porcupine Creek then he would make sure that the BFI note was only in her name and would reduce the security on the subject note to just her 60%. Ms. Blixseth did as requested, but the Bank did not make the adjustments per Mr. Rye's statement.

10. As stated in the explanation in paragraph 8 above, Ms. Blixseth did not obtain the extension and additional advance of $2,000,000 "purportedly on behalf of BFI". Rather, she did so based upon the representations of Mr. Rye. Additionally, she did not receive an additional advance of $2,000,000. These monies went to pay interest that had accrued, towards interest reserve, and $1,000,000 to BGI in exchange for using BGI property as collateral as requested by Mr. Rye.

11. Ms. Blixseth acknowledges that the first sentence is correct. However, she did not fail to provide notice for the transactions as she understood no notice was required.

Plaintiffs filed a Reply in Support of Motion for Summary Judgment on June 7, 2011. The matter is fully briefed and ready for decision.

## APPLICABLE LAW

### Fed.R.Bankr.P. 7056 - Summary Judgment

Summary judgment is governed by Fed.R.Bankr.P. 7056. Rule 7056, incorporating Fed.R.Civ.P. 56(c), states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law." "The proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial." *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (quoting *Grzybowski v. Aquaslide "N' Dive Corp. (In re Aquaslide "N" Dive Corp.)*, 85 B.R. 545, 547 (9th Cir. BAP 1987)). The manner in which this burden is proven depends on which party has the burden on a particular claim or defense at the time of trial.

> If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence–using any of the materials specified in Rule 56(c)–that would entitle it to a directed verdict if not controverted at trial. Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting additional time for discovery. If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 330-34, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986) (Brennan dissent) (citations omitted). *See also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102-06 (9th Cir. 2000) (discussing burdens for withstanding summary judgment).

When seeking summary judgment, the moving party must initially identify those portions of the record before the Court which it believes establish an absence of material fact. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). If the moving party adequately carries its burden, the party opposing summary judgment must then "set forth

specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986); FED. R. CIV. P. 56(e). *See also Frederick S. Wyle Prof'l. Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985) ("the opponent must affirmatively show that a material issue of fact remains in dispute"). That is, the opponent cannot assert the "mere existence of some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, "[a] party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

To demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge and the facts set forth therein must be admissible into evidence. *Aquaslide*, 85 B.R. at 547. All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Liberty Lobby,* 477 U.S. at 247-48, 106 S.Ct. at 2509. However, "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv.*, 809 F.2d at 630 (citing *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense." *Id*.

If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied. *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986). Thus, the Court's ultimate inquiry is to determine

whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence. *T.W. Elec. Serv.*, 809 F.2d at 631. In the absence of any disputed material facts, the inquiry shifts to whether the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

### 11 U.S.C. § 523(a)(4) – Fiduciary Capacity

Section 523(a)(4) provides that a " discharge under section 727 . . . does not discharge an individual debtor from any debt– . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." To prevail on their § 523(a)(4) claim, Plaintiffs are required to establish (1) that Debtor was acting in a fiduciary capacity, and (2) that Debtor committed a "defalcation" in that capacity. The scope of the term "fiduciary capacity" under § 523(a)(4) is a question of federal law. *See Mills v. Gergely (In re Gergely)*, 110 F.3d 1448, 1450 (9th Cir. 1997). The Ninth Circuit has adopted a narrow definition of "fiduciary" for purposes of § 523(a)(4), requiring that the fiduciary relationship arise from an express or technical trust that was imposed prior to the wrongdoing that caused the debt. *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996). Similarly, in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934), the Supreme Court instructed that the term "fiduciary capacity" is narrower here than it is in some other contexts: section 523(a)(4) covers only "express" or "technical trusts" and not trusts arising out of "the very act of wrongdoing." *See also Cal–Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1125 (9th Cir.2003) ("The broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context.... The fiduciary relationship must be one arising from an express or technical trust that

was imposed before and without reference to the wrongdoing that caused the debt.")

Establishing an express trust in Montana is straightforward and requires four elements: (1) intent to create a trust; (2) the existence of trust property; (3) designation of beneficiaries; and (4) compliance with the statute of frauds. MONT. CODE ANN. ("MCA") §§ 72-33-202, 203, 206, 208. As to the second element of § 523(a)(4), "[d]efalcation is defined as the 'misappropriation of trust funds or money held in any fiduciary capacity; [the] failure to account for such funds.'" *In re Bigelow*, 271 B.R. 178, 186 (9th Cir. BAP 2001), quoting *Lewis v. Scott*, 97 F.3d 1182, 1186 (9th Cir. 1996).

Plaintiffs do not allege the existence of either an express or a technical trust, but instead, based on MCA § 35-8-310, assert that Debtor was a fiduciary of BFI and its members. MCA § 35-8-310 provides:

> (1) The only fiduciary duties that a member owes to a member-managed company and the other members are the duty of loyalty imposed by subsection (2) and the duty of care imposed by subsection (3).
>
> (2) A member's duty of loyalty to a member-managed company and its other members is limited to the following:
>
>> (a) to account to the company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or derived from a use by the member of the company's property, including the appropriation of a company's opportunity;
>>
>> (b) to refrain from dealing with the company in the conduct or winding up of the company's business on behalf of a party or as a person having an interest adverse to the company; and
>>
>> (c) to refrain from competing with the company in the conduct of the company's business before the dissolution of the company.
>
> (3) A member's duty of care to a member-managed company and the other members in the conduct of and winding up of the company's business is limited to

8

refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

Plaintiffs argue that under Montana law, Debtor was acting in a fiduciary capacity with respect to the other members of BFI. Plaintiffs do not cite to a statute that would elevate a limited liability company to the status where trust-type obligations are imposed pursuant to statute or common law. However, that exact issue was recently discussed at length by the Bankruptcy Court in Idaho:

> To examine the nature of the relationship between LLC members the Court first looks to the applicable statutory framework. Section 53–622 of the Idaho Limited Liability Company Act, Idaho Code §§ 53–601 to –672 (2009) (the "Act"), provides:
>
>> Every member and manager must account to the limited liability company and hold as trustee for it any profit or benefit derived by that person without the consent of more than one-half (½) by number of the disinterested managers or members, or other persons participating in the management of the business or affairs of the limited liability company, from:
>>
>>> (a) Any transaction connected with the conduct or winding up of the limited liability company; or
>>>
>>> (b) Any use by the member or manager of its property, including, but not limited to, confidential or proprietary information of the limited liability company or other matters entrusted to the person as a result of his status as manager or member.
>
> Idaho Code § 53–622(2) (2009) (emphasis added).
>
> The Ninth Circuit considered language similar to that contained in Idaho Code § 53–622(2) in *Ragsdale,* a case in which the court was tasked with determining whether, under California law, partners acted in a fiduciary capacity toward each other for purposes of § 523(a)(4). 780 F.2d at 795–97. The provision at issue there, Cal. Corp.Code § 15021 (1977), provided:
>
>> Every partner must account *to the partnership* for any benefit, *and hold as trustee for it* any profits derived by him without the consent of the other

>partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

*Id.* at 796 (emphasis added). *Ragsdale* concluded that the California code provision did not establish the fiduciary relationship required by § 523(a)(4), noting that the statute created a trust only when a partner derived profits without consent of the partnership; just the sort of trust *ex maleficio* that courts, including the United States Supreme Court, had found to be outside the purview of § 523(a)(4). *Id.* (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Teichman*, 774 F.2d at 1399)).

However, the *Ragsdale* court went on to find that California case law had made all partners trustees over the assets of the partnership, thereby elevating the duties of partners beyond those required by the literal wording of the statute. Relying on these state court decisions, the panel held that in California partners were fiduciaries within the meaning of § 523(a)(4). *Id*. at 796–97; *see also Lewis*, 97 F.3d at 1185–86 (concluding Arizona law rendered partners trustees for purposes of § 523(a)(4)); *Lewis v. Short (In re Short)*, 818 F.2d 693, 695 (9th Cir.1987) (reaching the same conclusion applying Washington law).

*Ragsdale* and its progeny are instructive here. Although those decisions preclude the Court from holding that the language of Idaho Code § 53–622(2) creates the type of express trust required by § 523(a)(4), if Idaho case law has expanded the duties of LLC members to make them trustees over LLC assets, those members may qualify as fiduciaries under § 523(a)(4). *See Streibick v. Murrell (In re Murrell)*, 04.3 I.B.C.R. 122, 126 (Bankr.D.Idaho 2004) (turning to state case law to determine whether corporate officers and directors were fiduciaries in the absence of an express agreement or statutorily-created trust) (citing *Cantrell*, 329 F.3d at 1126–28).

The Idaho Supreme Court has only recently considered the issue of fiduciary duties between LLC members. *See Bushi v. Sage Health Care, PLLC*, 146 Idaho 764, 203 P.3d 694, 699–700 (Idaho 2009). While finding that the Act did not expressly list any such duties, the court in *Bushi* concluded that LLC members did owe one another the fiduciary duties of trust and loyalty. *Id.* at 699. However, *Bushi* did not go so far as to deem LLC members to be trustees over LLC assets. Absent such a pronouncement, this Court declines to find Idaho LLC members are fiduciaries within the narrow meaning of § 523(a)(4). *See Ragsdale,* 780 F.2d at 796 ("The broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context."); *Honkanen*, 446 B.R. at ——, 2011 WL 781831, at *3 ("The mere fact that state law puts two parties in a fiduciary-like relationship does not necessarily mean it is a fiduciary relationship within 11 U.S.C. § 523(a)(4)."). Accordingly,

>the Court concludes that Recyclers, Debtors' closely-held entity, was not acting in a fiduciary capacity with respect to Murray, its fellow LLC member.

*In re Woodman*, — B.R. —, 2011 WL 1100264, at *4-5 (Bankr. D. Idaho 2011).

## CONTENTIONS of the PARTIES

Each of the Plaintiffs seeks to except from Debtor's discharge the sum of $1 million, plus costs, interest, and attorneys fees. Plaintiffs do not claim in their pending motion that Debtor committed larceny or embezzlement, but rather, contend only that Debtor committed fraud or defalcation while acting in a fiduciary capacity pursuant to 11 U.S.C. § 523(a)(4). The Plaintiffs assert they are entitled to summary judgment as a matter of law because (1) Debtor, as Managing Member of BFI, had fiduciary duties to Plaintiffs as Managing Member of BFI, (2) Debtor committed defalcation while acting in that capacity with respect to pledging corporate assets for personal loans and obligating BFI to the loans, and (3) that Plaintiffs have been damaged in an amount equal to the diminished value of the corporate assets.

Debtor counters that, upon the advice of counsel, she believed she had the authority to seek a loan on behalf of BFI. Debtor also maintains that she intended to obtain a loan from First Bank secured only by her 60% percent interest in the S.P. Realty note. Debtor next counters that Plaintiffs' claim in this case is inconsistent with their counterclaim against First Bank wherein they argue the First Bank notes were invalid. Finally, Debtor argues that Plaintiffs have not proven any damages.

## DISCUSSION

To begin, the Court agrees with Plaintiffs that Debtor knew exactly what she was doing when she caused BFI to enter into loan commitments with First Bank and pledge the S.P. Realty

Note as security. Debtor's assertion that she thought she was pledging only 60% of the S.P. Realty Note as security for BFI's loan is not supported by the record. However, the facts likewise do not support Plaintiffs' claim that Debtor knew she was not authorized to secure the loans in question on behalf of BFI.

The record indicates that in April of 2007, Debtor had a 30% ownership interest in BFI, Timothy L. Blixseth had a 30% ownership interest in BFI, the Beau Blixseth Trust had a 10% ownership interest in BFI, the Morgan Blixseth Trust had a 10% ownership interest in BFI, and Matthew Crocker and Julie Barve, either through trusts or individually, each owned a 10% ownership interest in BFI. During the time of the foregoing ownership structure, Debtor secured a $2.5 million loan from Palm Desert National Bank. The Negative Covenants in an Addendum to Business Loan Agreement between Debtor and Palm Desert National Bank dated April 9, 2007, recites that Debtor "holds an interest in Blixseth Family Investments, LLC, a Montana Limited Liability Company ('BFI'). Borrower represents that she is currently prohibited by the BFI Operating Agreement from pledging such interest in BFI to secure the Loan." Debtor's representation to Palm Desert National Bank on or about April 9, 2007, is consistent with paragraph 11.1 of BFI's operating agreement, which reads: "No Member may transfer all or any part of such Member's interest as a member of the Company except as permitted in this agreement. Any purported transfer of an interest or a portion of an interest in violation of the terms of this agreement will be null and void and of no effect. For purposes of this section a 'transfer' includes a sale, exchange, pledge, or other disposition, voluntarily or by operation of law."

The ownership structure of BFI subsequently changed. On November 1, 2007, Timothy

L. Blixseth assigned his 30% ownership interest in BFI to Debtor, giving Debtor a 60% ownership interest in BFI. On December 13, 2007, Timothy L. Blixseth and Debtor, as trustees of the Beau Blixseth and Morgan Blixseth Trusts, conveyed each of the Trusts' 10% ownership interests in BFI to Beau Blixseth and Morgan Blixseth individually.[2] Also on December 13, 2007, Debtor executed two documents permitting Beau Blixseth and Morgan Blixseth to become Members of BFI, with each receiving their current 10% ownership interests.

Also in 2007, Alan Rye, an executive vice president of First Bank who was also in charge of First Bank's Southern California real estate group, learned that Debtor and Timothy L. Blixseth were divorcing and that Debtor may have a need for short-term funding. Rye thus contacted Debtor to see if he could be of some assistance. Following that contact, First Bank agreed to loan Debtor $5 million on or about November 15, 2007. The $5 million loan transaction was unsecured and was a stopgap until First Bank could finalize a $30 million line of credit secured by Porcupine Creek, Debtor's 230-acre residence in California. At that time, Rye expected that Debtor would be able to repay the loan from the sale of multiple assets and from distributions from the divorce proceeding.

The November 15, 2007, loan matured in early 2008 and Debtor was not able to payoff the obligation as anticipated. First Bank was amiable to making Debtor a new loan. However, First Bank now wanted security. First Bank determined at that time that it would make a loan to BFI, with the $35 million S.P. Realty Note serving as collateral. Debtor, on behalf of BFI, thus

---

[2] Pursuant to MCA § 72-33-412, if the principal of a trust does not exceed $20,000, the trustee has the power to terminate a trust without court approval. Based upon such statutory provision, on January 1, 2008, Debtor and Timothy L. Blixseth executed two Trust Termination Agreements, terminating the Beau Blixseth Trust and the Morgan Blixseth Trust, and directing that the Trust principal, if any, be distributed to Beau Blixseth and Morgan Blixseth, respectively.

proceeded on or about February 27, 2008, to secure an $8 million loan from First Bank. At this same time, BFI approved an $8 million unsecured loan to Debtor.

From the $8 million loan, First Bank retained sufficient proceeds to pay off Debtor's previous $5 million loan, and after payment of various costs, interest, etc., the balance of the proceeds were disbursed to Debtor. The primary source of repayment at that time was expected to be Debtor's personal residence, Porcupine Creek, which was owned by BLX Group, Inc., and the sale of the Yellowstone Club. The S.P. Realty Note was not listed on the loan documents as either a primary or secondary source of repayment for the $8 million loan, but Debtor gave First Bank possession of the S.P. Realty Note. Rye consulted First Bank's counsel about the $8 million loan transaction to confirm that Debtor had the ability to bind BFI. Rye contends that he, Debtor and either Matthew Crocker or Julie Barve were present when Debtor signed the loan documents for the $8 million loan. However, Exhibit 165 at docket entry no. 87-18 shows that "the BFI authorizing documents with respect to the $8 million dollar First Bank Loan to BFI, and the subsequent loan from BFI to Edra[,]" consisting of perhaps the consents of Matthew Crocker and Julie Barve and a Revolving Line of Credit, were not signed until sometime after April 9, 2008.

As the maturity date of BFI's $8 million loan approached, Debtor and First Bank began discussing an extension of the $8 million loan. First Bank and BFI subsequently extended the $8 million loan agreement, increased the loan amount to $10 million loan and as an incentive to extend the loan, Debtor, through BLX Group, Inc., granted First Bank a Trust Deed against Porcupine Creek. In return, First Bank agreed to subordinate the S.P. Realty Promissory Note to BLX Group, Inc. *See* Exhibit 138 at docket entry no. 87-34, which is a Commercial Credit

14

Approval Form dated January 6, 2009, accompanied by a Corporation Resolution of BFI signed by Debtor dated January 15, 2009.

The Court agrees that BFI's operating agreement precluded Debtor from pledging or transferring her BFI Membership interest "except as permitted" by the operating agreement. However, the Plaintiffs do not cite to any fact that would preclude Debtor, as the Managing Member and an owner of a 60% interest in BFI, with the consent of two other Members who owned a combined 20% interest in BFI, from causing BFI to enter into a loan agreement with First Bank and then loan such proceeds to herself. A question of fact remains as to whether Debtor was permitted to undertake such actions on behalf of BFI.

The Court similarly finds an issue of fact concerning the Plaintiffs' request for damages. One material fact that is not answered in the Plaintiffs' Statement of Uncontroverted Facts is the extent Plaintiffs were damaged given that Debtor executed a personal note in favor of BFI. Also, Debtor raises material issues of fact stemming from the current action to void BFI's note with First Bank. If the note is voided, Plaintiffs' damages may be nothing at all or at least, very minimal. Finally, Plaintiffs have not convinced this Court that they are each entitled to $1 million each because the evidence suggests at this time that S.P. Realty has not made a payment on the S.P. Realty Note since January of 2008. If S.P. Realty is not paying on its Note, a question arises as to its value. The Court might not reach this question if Plaintiffs' claim was formulated somewhat differently. However, as noted above, Plaintiffs seek damages equal to the "diminished value" of BFI's assets. If the assets of BFI were and are valueless, Plaintiffs have not suffered any damage as a result of Debtor's actions. Under such scenario, Plaintiffs' claim for damages should instead be for their proportionate share of the loan proceeds.

Given the existing issues of material fact and in accordance with the foregoing, the Court will enter a separate order providing as follows:

IT IS ORDERED that Plaintiffs' Motion for Summary Judgment filed May 11, 2011, is denied.

BY THE COURT

_____
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana