## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **EDRA D BLIXSETH**, | Case No.  **09-60452-7** |
| Debtor. | |
| | |
| **BEAU BLIXSETH** and **MORGAN BLIXSETH**, | |
| Plaintiffs. | |
| -vs- | Adv No.  **10-00018** |
| **EDRA D BLIXSETH**, | |
| Defendant. | |

# MEMORANDUM of DECISION
# and
# ORDER

At Butte in said District this 28th day of September, 2011.

In this Adversary Proceeding, after due notice, the Court conducted a trial on June 20, 2011, in Missoula on the Plaintiffs Beau and Morgan Blixseth's (collectively "the Blixseths") complaint to deny Debtor/Defendant Edra D. Blixseth's ("Edra") discharge under 11 U.S.C. § 523(a)(4).[1]  The Blixseths were represented at trial by Kevin O'Connell and Mark R. Sandri of

---

[1]  Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

1

Portland, Oregon and Jon Binney of Missoula, Montana; Edra was represented at trial by Gary S. Deschenes of Great Falls, Montana.  Edra, Morgan Blixseth ("Morgan"), Beau Blixseth ("Beau") and Richard Samson ("Samson"), the Chapter 7 Trustee in Debtor's main bankruptcy case, testified.  The Blixseths' Exhibits 101 through 205 and Edra's Exhibits A through E were admitted into evidence.  The Court also agreed at trial to take judicial notice of Blixseth Family Investment's proof of claim no. 53 filed August 6, 2009, which Proof of Claim was also admitted into evidence as the Blixseths' Exhibit 198.  The Court entered an Order on June 30, 2011, granting the Blixseths' Motion for Leave to File Deposition of Alan Rye For Use As Perpetuated Testimony, subject to the errata sheet filed separately on June 29, 2011, at docket entry no. 112. At the conclusion of the Blixseths' case-in-chief, Edra's counsel made an oral request for directed verdict.  The Court took Edra's request under advisement and proceeded with trial.  At the conclusion of trial, the Court gave the parties additional time to file post-trial briefs.  The Blixseths and Edra have filed their post-trial briefs and the matter is ready for decision.  This Memorandum of Decision and Order sets forth the Court's findings of fact and conclusions of law.

BACKGROUND

The parties agree in the Final Pretrial Order that the following facts are undisputed:

a.    Debtor, Edra Blixseth's bankruptcy case was filed on March 26, 2009, under Chapter 11 of the Bankruptcy Code.

b.    Edra's case was converted from a Chapter 11 to a Chapter 7 by Order of this Court entered May 29, 2009.

c.    At all relevant times, Blixseth Family Investments, LLC ("BFI") was a Montana

limited liability company formed on August 22, 2000 and governed by an Operating Agreement of the same date.

d.    At all relevant times, Plaintiffs, Beau and Morgan Blixseth, each owned a 10% interest in BFI.  Edra owned a 60% interest in BFI and served as its Managing Member.

e.    As a Managing Member of BFI, Edra had fiduciary duties to all members, including Plaintiffs.

f.    At all relevant times, BFI's primary asset was a promissory note in the face amount of $35,650,000 ("the BFI Promissory Note").

g.    In November 2007, Edra obtained an unsecured loan from First Bank in the amount of $5,000,0000.

h.    In March 2008, Edra, as Managing Member of BFI, executed loan documents for an $8,000,000 loan from First Bank.  None of the proceeds of the loan went to BFI.

i.    Following the $8,000,000 loan from First Bank to BFI, BFI approved an $8,000,000 unsecured loan to Edra.  Edra used $5,000,000 of the proceeds of this loan to pay off her unsecured $5,000,000 loan to First Bank.

j.    Edra did not provide notice to or seek approval of Plaintiffs for the above-referenced transactions.

k.    In January 2009, Edra, as Managing Member of BFI, executed loan documents for an extension of the $8,000,000 loan and an additional $2,000,000 advance from First Bank. None of the loan proceeds went to BFI.

l.    Neither BFI nor Plaintiffs received any benefit from the loan transactions described herein.  The only member of BFI that received any benefit from the $8,000,000 loan

3

and/or $2,000,000 additional advance was Edra.

      m.    On August 6, 2009, BFI filed a claim in Edra's bankruptcy in the amount of $10,749,095.89.

      n.    On February 24, 2011, First Bank filed a Complaint against BFI for Breach of Contract and Money Had and Received in the Superior Court of California.  The Complaint relates to the loan transactions described herein and alleges damages in the amount of $11,515,762.64.

      In addition to the foregoing, the evidence shows that in August of 2000, Edra, Timothy L. Blixseth ("Tim"), Julie Barve, Matthew Crocker, the Beau Blixseth Trust and the Morgan Blixseth Trust entered into a Restated and Revised Operating Agreement with the "purpose of forming a limited liability company" known as Blixseth Family Investments, LLC which was "to be managed by one manager[.]"[2] Tim and Edra were Trustees of the Beau Blixseth Trust and the Morgan Blixseth Trust.  In 2000, Edra had a 30% ownership interest in BFI, Tim had a 30% ownership interest in BFI, and the Beau Blixseth Trust, the Morgan Blixseth Trust, Matthew Crocker and Julie Barve each had a 10% ownership interest in BFI.

      Edra testified that prior to January 1, 2005, BFI and an entity owned by James J. Dolan ("Dolan") owned what was referred to as Spanish Peaks.  Dolan also owned both A and B shares in the Yellowstone Club, an exclusive private ski and golf community located in Big Sky, Montana.[3]  Dolan and Tim decided Dolan should relinquish his A and B shares in the

---

    [2] Julie Barve and Matthew Crocker are Edra's biological children from a prior union. Beau and Morgan are Tim's children from a prior union.

    [3] Tim and Edra were the founders of Yellowstone Mountain Club, LLC ("YMC"), Yellowstone Development, LLC ("YD"), Big Sky Ridge, LLC, and Yellowstone Club

Yellowstone Club and BFI would, in return, relinquish its ownership interest in Spanish Peaks. To effectuate the agreement, Dolan transferred his A and B shares in the Yellowstone Club to BFI. In addition, S.P. Realty, LP[4] executed a Promissory Note in favor of BFI dated January 1, 2005, in the amount of $35,650,000. The Promissory Note provides that S.P. Realty, LP would make an initial payment of $3 million to BFI on January 5, 2006, which amount would be applied to principal reduction. The Promissory Note also provides that on January 5, 2007, the remaining principal balance plus any accrued interest would "be amortized over the next eight (8) years with interest calculated at three and one-half percent (3.5%) per annum commencing January 2, 2005." The Promissory Note is secured by a Membership Pledge Agreement which "pledg[es] a security interest in 100 membership units in Spanish Peaks Development, LLC." The S.P. Realty note is not accompanied by any real estate documents and is not secured by a mortgage, trust indenture or Uniform Commercial Code security agreement. S.P. Realty, LP made the required payment under the Promissory Note in January 2006. S.P. Realty, LP also made the payments due in 2007 and 2008. It is not clear from the evidence whether the membership units, which supposedly serve as collateral for the Promissory Note, still exist.

Edra and Tim separated in late 2006 and Edra filed for divorce in December of 2006. In

_____

Construction Company, LLC. The four aforementioned limited liability companies generally comprised what was referred to as the Yellowstone Club. From its inception to August 12, 2008, Tim was the sole managing member of Big Sky Ridge, LLC. From their inception to August 12, 2008, YMC and YD were controlled by Tim, through his holding company, Blixseth Group, Inc. ("BGI"). From August of 2001, to August 12, 2008, BGI owned 82.6532 percent of the Class A stock in YMC and YD. Edra was awarded BGI on August 12, 2008. Edra changed the name of BGI to BLX Group, Inc. ("BLX") in August of 2008.

[4] It appears that the general partner of S.P. Realty is 1776 Holdings, LLC, whose sole member is Dolan.

April of 2007, after her separation from Tim, Edra secured a $2.5 million loan from Palm Desert

National Bank.  The Negative Covenants of an Addendum to Business Loan Agreement between

Edra and Palm Desert National Bank dated April 9, 2007, recite that Edra "holds an interest in

Blixseth Family Investments, LLC, a Montana Limited Liability Company ('BFI').  Borrower

represents that she is currently prohibited by the BFI Operating Agreement from pledging such

interest in BFI to secure the Loan."  Edra's representation to Palm Desert National Bank on or

about April 9, 2007, is consistent with paragraph 11.1 of BFI's operating agreement, which

reads: "No Member may transfer all or any part of such Member's interest as a member of the

Company except as permitted in this agreement.  Any purported transfer of an interest or a

portion of an interest in violation of the terms of this agreement will be null and void and of no

effect.  For purposes of this section a 'transfer' includes a sale, exchange, pledge, or other

disposition, voluntarily or by operation of law."  The $2.5 million loan from Palm Desert

National Bank matured April 9, 2008.

Edra contends S.P. Realty made a payment of $6.8 million to BFI in April of 2007, but

that Tim took all the proceeds for himself.  In late July 2007, Edra and her children, Julie Barve

and Matthew Crocker, prepared a document that sought to expel Tim from BFI.  As reflected in

Exhibit 104, Edra alleged that Tim claimed sole control over BFI's books, records and

operations, that Edra was entitled to an equal allocation of the first $8,799,576.49 of BFI's net

profits,[5] that Edra had received nothing and that as of July 17, 2007, BFI had no cash available,

---

[5]  Paragraphs 3.2 and 3.3 of the August 22, 2000, Restated and Revised Operating
Agreement provide: "Notwithstanding the provisions of the Section of this Agreement relating to
the allocation of net profits and net losses, the first $8,799,576.49 in net profits shall be allocated
to Members Timothy L. Blixseth and Edra D. Blixseth equally.  After the first $8,799,576.49 in
net profits allocation, "the net profits or net losses of the Company for any fiscal year will be

despite the $6.8 million payment BFI received April 2, 2007.

In lieu of having to provide an accounting of S.P. Realty's 2007 payment to BFI, Tim agreed on November 1, 2007, to assign his 30% ownership interest in BFI to Edra, giving Edra a 60% ownership interest in BFI. On December 13, 2007, Tim and Edra, as trustees of the Beau Blixseth and Morgan Blixseth Trusts, conveyed each of the Trusts' 10% ownership interests in BFI to Beau and Morgan individually.[6] Also on December 13, 2007, Edra executed two documents permitting Beau and Morgan to become Members of BFI, with each receiving their current 10% ownership interests.

In 2007, Alan Rye ("Rye"), an executive vice president of First Bank who was also in charge of First Bank's Southern California real estate group, learned that Edra and Tim were divorcing and that Edra may have a need for short-term funding.[7] Rye thus contacted Edra.

---

allocated among the Members to be divided between them in proportion to their Ownership Interests." The S.P. Realty note did not come into existence until January 1, 2005. Edra indicated, without contradiction by the Blixseths, that the first $3 million principal payment made by S.P. Realty on or about January 5, 2006, was not considered part of the $8,799,576.49 figure referenced in the Special Allocation of Profits paragraph, paragraph 3.2, of the Operating Agreement. Tim took the entire $6.8 million payment made by S.P. Realty in 2007. Edra paid Beau and Morgan ten percent of the entire payment, less a hold back for some admittedly exorbitant legal fees, made by S.P. Realty in 2008, even though Edra could have withheld additional net profits still due under paragraph 3.2 of the Operating Agreement.

[6] Pursuant to MONT. CODE ANN. ("MCA") § 72-33-412, if the principal of a trust does not exceed $20,000, the trustee has the power to terminate a trust without court approval. Based upon such statutory provision, on January 1, 2008, Tim and Edra executed two Trust Termination Agreements, terminating the Beau Blixseth Trust and the Morgan Blixseth Trust, and directing that the Trust principal, if any, be distributed to Beau and Morgan, respectively.

[7] Rye first became acquainted with Tim and Edra in 2002 when First Bank extended a line of credit to Tim and Blixseth Group, Inc., n.k.a. BLX Group, Inc. Rye testified First Bank extended a line of credit on Porcupine Creek and also extended a construction loan for the Warren Miller Lodge at the Yellowstone Club. Prior to 2007, First Bank had not extended any loans to Edra personally.

7

Following that contact, First Bank agreed to loan Edra $5 million on or about November 15, 2007.  The $5 million loan transaction was set up as an unsecured line of credit and was intended to be a stopgap until First Bank could finalize a $30 million line of credit secured by Porcupine Creek, Tim and Edra's 230-acre personal residence in California.[8]  At that time, Rye expected Edra would be able to repay the loan from the sale of multiple assets and from distributions from the divorce proceeding.  First Bank's November 15, 2007, loan matured March 1, 2008.

S.P. Realty made a payment of $4,875,696 to BFI on January 14, 2008.  Edra caused BFI to distribute $443,716 each to Beau, Morgan, Julie Barve and Matthew Crocker.  Edra also caused BFI to pay Beau and Morgan an additional $25,742.15 each on an undisclosed date.  It is not clear what Edra did with her share of S.P. Realty's 2008 payment to BFI, but Edra agreed that it was fair to say that none of S.P. Realty's 2008 payment was used to pay down Edra's $5 million obligation to First Bank.  As noted above, the November 15, 2007, loan matured March 1, 2008.  Edra was not able to payoff the obligation at maturity.

As the March 1, 2008, maturity date approached, First Bank expressed its willingness to extend Edra's loan.  However, First Bank wanted to secure its position as a condition to extending the loan.  Many assets, such as Porcupine Creek, which Edra anticipated receiving through her divorce proceeding, were still owned jointly by Tim and Edra because the divorce had not yet been finalized.  At some point, Rye concluded that the best course of action was to extend a 4-month $8 million line of credit to BFI.  Rye consulted First Bank's counsel about the

---

[8]  The Porcupine Creek property was described in proceedings in Edra's main bankruptcy case as an opulent "[g]ated, private, 230± acre estate with a luxury estate home, [signature] golf course, four guest houses, extensive amenities and extensive landscape" that appraised for roughly $195,000,000 in October of 2007.

$8 million loan transaction to confirm that Edra had the ability to bind BFI. The purpose of the line of credit was to pay off Edra's $5 million loan and provide Edra with short terms funds. Exhibit 133 reflects that on or about February 27, 2008, S.P. Realty's note had a principal balance of $24.49 million and that the "remaining balance [was to be] paid over the next six years in equal installments of $4,081,250 plus interest."  Edra did not fully understand Rye's proposal involving BFI and expressed her confusion in an email dated March 4, 2008:

> I thought, if we knew that we had a title company that would insure the title for the larger loan, that we were not going to have to pledge BFI payments for this loan?  Jim Dolan is a great guy, fair and honest, but he hold [sic] a third interest in Western Pacific Timber with Tim.  He was also our partner in Yellowstone Jet Center, which Tim, without my knowledge or approval, just sold to him for 3.5m. I would really rather not have to send anything to Jim at this time.  Since we know that there is a way to get title insurance and we can get the larger LOC done now, is there any way we can just do this one on a sig note as well?  I thought that this is what we had talked about on the phone at the end of last week as the easiest way to do this now?  We would pay off the 5.0m sig loan and only be adding 2 or 3m, with a interest hold back, on a sig bases.

Notwithstanding her desire to obtain funds in a different manner, Edra, with assurances from First Bank's counsel and her personal counsel that she had authority to do so, caused BFI to secure a line of credit from First Bank.  From the $8 million loan, First Bank retained sufficient proceeds to pay off Edra's previous $5 million loan, and after payment of various costs, interest, etc., the balance of the proceeds were disbursed to Edra.  The primary source of repayment at that time was expected to be a $30 million line of credit secured by Porcupine Creek, which was owned by BLX Group, Inc., and the sale of the Yellowstone Club.  The S.P. Realty Note was not listed on the loan documents as either a primary or secondary source of repayment for the $8 million loan, but as reflected in an Allonge dated March 18, 2008, Edra, as the manager of BFI, transferred and assigned all BFI's "right, title and interest in" S.P. Realty's Promissory Note to

9

First Bank.

Rye testified that he, Edra and either Matthew Crocker or Julie Barve were present when Edra signed the loan documents for the $8 million loan.  Exhibits 116 and 177 are "Action by Written Consent of Members of Blixseth Family Investments, LLC" signed by Edra, Julie Barve and Matthew Crocker dated March 9, 2008.  In the Action documents, Edra, Julie Barve and Matthew Crocker ratified BFI's $8 million loan with First Bank, ratified BFI's assignment of S.P. Realty's note to First Bank and ratified BFI's loan of $8 million to Edra.  With respect to BFI's $8 million loan to Edra, the Action document at Exhibit 117 recites that "it was advisable and in the best interests of [BFI] to make the Company Loan to EDRA because [BFI] obtained a reasonable rate of return on the Company Loan investment because the interest rate under the Company Loan is one percent (1%) in excess of the interest rate that [BFI] will be charged by First bank under the First Bank Loan."

Beau concedes that had certain things happened, Edra would have been able to repay her $8 million note to BFI.  However, Beau further testified that he "live[s] in the real world" and certain things did not happen, and Edra did not repay the $8 million note.

Notwithstanding the date of the Action documents, Exhibit 165 suggests that "the BFI authorizing documents with respect to the $8 million dollar First Bank Loan to BFI, and the subsequent loan from BFI to Edra[,]" consisting of perhaps the consents of Matthew Crocker and Julie Barve and a Revolving Line of Credit, were not signed until sometime after April 9, 2008. Whether the documents were signed on March 9, 2008, or sometime after April 9, 2008, Edra's actions on behalf of BFI were ratified by members holding a collective 80% ownership interest in BFI.

10

As the maturity date of BFI's $8 million loan approached, Edra and First Bank began discussing an extension of the $8 million loan. On July 30, 2008, Edra, on behalf of BFI, signed an Extension and Modification Agreement extending the July 1, 2008, maturity date of the $8 million loan to October 1, 2008.

In mid-2008, Edra began negotiating with other lenders to secure longer term financing, not only for her existing obligations, but also to finalize her divorce with Tim. Edra originally believed she had reached a deal with Wachovia but that deal fell apart due to Wachovia's "catastrophic issues." Edra then scrambled to find "hard money" to get her divorce finalized so she could start putting her affairs back in order. Edra eventually secured a 30 or 45-day $35 million loan from CrossHarbor Capital Partners. Edra expected to repay the CrossHarbor Capital Partners' loan with funds she hoped to obtain from "hard moneylender," Archer Capital. The CrossHarbor Capital Partners' loan proceeds were used to finalize Edra's divorce from Tim, including substantial payments to or on behalf of Tim, and to pay a financing fee to Archer Capital.

The extended maturity date of BFI's $8 million loan expired, and Edra had not secured funds to repay the loan. As a result, on January 6, 2009, First Bank agreed to extend the $8 million loan agreement for an additional twelve months and advance an additional $2 million to BFI, thereby increasing the total loan amount to $10 million. As an incentive to First Bank to extend the loan, Edra, through BLX Group, Inc., granted First Bank a fourth position Trust Deed against Porcupine Creek. The purpose of the extension and additional advance was to provide Edra "additional funds and necessary time to consummate various cash flow raising activities, which would repay the loan." As partial compensation to BLX Group, Inc. for granting First

11

Bank a Trust Deed against Porcupine Creek, First Bank agreed to allow BLX Group, Inc. to place a second lien, behind First Bank's $10 million lien, against S.P. Realty's note. *See* Exhibit 138, Commercial Credit Approval Form dated January 6, 2009, accompanied by a Corporation Resolution of BFI signed by Edra on January 15, 2009.

S.P. Realty did not make its scheduled payment to BFI in 2009 and in fact, has not made a payment since its payment of $4,875,696 made January 14, 2008. Beau telephoned Dolan in August of 2009 and asked if Dolan could make the required payment. Dolan responded that he could not make the payment because he did not have the ability to do so. Dolan advised Beau at that time that "if you foreclose on this, that [S.P. Realty] doesn't hold anything and it will file for bankruptcy." Similarly, in an email to Edra dated April 2, 2009, Dolan advised Edra that "these assets are not worth a damn today and the cash flows are negative."

Beau conceded that had Dolan made the payments scheduled for 2009, 2010 and 2011, Edra would have received sufficient funds to repay BFI's obligation to First Bank in full, plus make the required distributions to Beau and Morgan. Edra expressed her belief that Dolan did not pay the S.P. Realty note in 2009 and thereafter at the "direction of Tim[.]" Edra explained that "when that note wasn't paid, that was the domino effect or I wouldn't be sitting here today, expecting that $5 million to be paid. And shortly thereafter is when I had to file the bankruptcy."[9]

---

[9] In an email to her attorneys, and other parties, dated January 7, 2009, Edra wrote:

> Tim has called Alan Rye, my banker with First Bank, three times. He has asked about loans I have and loans with BFI. Alan has told him that these are none of any thing he owns or is involved with. Tim went on to say that the BFI note receivable, was not going to be paid by Jim Dolan on the due date and might no[t] be at all. (It was due this past Monday. Less then

Edra filed a voluntary Chapter 11 bankruptcy petition on March 26, 2009. Edra's bankruptcy was converted to Chapter 7 on May 29, 2009, and Samson was appointed the Chapter 7 Trustee of Edra's bankruptcy estate. In July 2009, the members of BFI voted to remove Edra as manager of BFI and replace Edra with Beau. Beau served as a manager of BFI for a period of two months. During his tenure as manager, Beau caused BFI to file a proof of claim in Edra's case on August 6, 2009, wherein BFI asserts an unsecured claim against Edra in the amount of $10,749,095.89. Neither Beau nor Morgan filed individual claims against Edra.

Edra's son, Matthew Crocker, filed a voluntary Chapter 7 bankruptcy petition on February 13, 2009. The Chapter 7 Trustee in Matthew's bankruptcy, Joseph V. Womack, took over as manager of BFI after Beau's two-month stint was concluded. An involuntary Chapter 11 bankruptcy petition was filed on behalf of BLX Group, Inc. on September 21, 2009. First Bank did not receive any payment from the sale of the Porcupine Creek property in BLX Group, Inc.'s bankruptcy proceeding.

Western Capital Partners is a creditor of Edra and Matthew Crocker. Western Capital

---

four weeks ago, I sent Jim a note asking if he was going to need an extension as I was counting on this money coming in for my cash flow. He told me he would not need one.) We received a note from Dolan's guy that said they were going to need the 10 day grace period. This is a 5.0mm payment that we were counting on for the bank loan to redo and get an additional 2.0mm for operating cost. Now it is question and it seems that Dolan is not going to pay.

* * *

Tim has NO business with Alan and there was no need for him to be calling him, except to plant doubt in Alan's mind about their collateral for the loan, which worked, as Alan is now concerned and wants to get secured another way.

13

Partners contends it is now the owner of Edra and Matthew's combined 70 percent interest in BFI.  The parties state Western Capital Partners and Samson are threatening to litigate or are litigating who is the appropriate party to pursue collection of the S.P. Realty note.

Beau testified he first heard rumors about First Bank's $8 million loan to BFI from Tim.[10] Counsel for Beau and Morgan sent a letter dated April 2, 2008, requesting that Edra's counsel "look into the assertion that Edra is attempting to pledge BFI's $30 million account receivable with Spanish Peaks as collateral in an $8 million bank loan with the Newport Beach Bank." Beau testified he did not definitively learn of BFI's $8 million loan with First Bank until the summer of 2009 after Samson was appointed Trustee in Edra's bankruptcy case.  Beau's testimony is inconsistent with the letter of April 2, 2008, and an email he sent dated January 30, 2009, in which is wrote that if Edra continued to deny his requests for full disclosure of BFI's financial records, Edra should then be "prepared to answer for . . . the loan she took out against the Dolan note[.]"

First Bank initiated a state court lawsuit against BFI in the Superior Court for the County of Orange, State of California on or about February 24, 2011, seeking to collect on its note. Western Capital Partners, on behalf of BFI, asserts three counterclaims in that action, including a claim the $8 million note and any purported pledge or assignment of the S.P. Realty note by BFI to First Bank are void.

For reasons unexplained, not a single party, including First Bank, has pursued collection

---

[10]  Beau believed Tim learned of the $8 million loan from Dolan.  An email exchange between Rye and Daniel J. Daugherty dated March 4, 2008, found at Exhibit 152, states that First Bank had to obtain Dolan's signature to complete the Collateral Assignment of Note and Membership Pledge.

14

of the S.P. Realty note.  Samson, however, testified that Joseph V. Womack, the Chapter 7

Trustee of Matthew Crocker's bankruptcy estate and the Manager of BFI in late 2009, had talked

with the Goetz law firm in Bozeman and they had agreed to pursue the S.P. Realty note on a

contingency fee basis.  Beau asked Samson and Womack to hold off retaining the Goetz law firm

to pursue the S.P. Realty note because Beau wanted to find a different law firm to pursue

collection of the S.P. Realty note.  Beau located another attorney in Bozeman, but Samson was

not comfortable moving forward because he had never heard of the attorney.  Beau also told

Samson at or about this same time that he wanted additional time to talk personally to Dolan.

Western Capital Partners then entered the scene, and Samson elected not to pursue the S.P.

Realty matter further.

## CONTENTIONS of the PARTIES

Beau and Morgan each seek to except from Edra's discharge the sum of $1 million, plus

costs, interest, and attorneys fees.  The Blixseths do not claim Edra committed larceny or

embezzlement, but rather, contend only that Edra committed fraud or defalcation while acting in

a fiduciary capacity pursuant to 11 U.S.C. § 523(a)(4).  The Blixseths assert they are entitled to

judgment in their favor because (1) Edra, as Managing Member of BFI, had a fiduciary duty to

manage the funds of BFI for the benefit of its members, (2) Edra committed fraud or defalcation

while acting in that capacity when she obtained loans, purportedly on behalf of BFI, for her own

personal benefit, using BFI assets as collateral and obligating BFI for repayment of the loan, and

(3) that Blixseths have been damaged as a result.  In response, Edra asserts several elements of

defense, many of which are not applicable in this proceeding.  Applicable here are Edra's claims

that any fiduciary relationship Edra may have had was not a fiduciary relationship within §

15

523(a)(4), that Edra was authorized to secure the loans in question, that Edra had the authority to enter into a loan agreement with First Bank and then loan the proceeds to herself, and that Blixseths have suffered no damages. Edra also challenges the Blixseths' standing to bring the pending claim.

**APPLICABLE LAW and DISCUSSION**

The Blixseths each seek to except $1 million from Edra's discharge under 11 U.S.C. § 523(a)(4). It is well-settled that the Bankruptcy Code's central purpose is to provide a fresh start to the honest but unfortunate debtor. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). However, under certain circumstances, a creditor may seek to except from a debtor's discharge certain debts. *See* 11 U.S.C. § 523(a). Nevertheless, consistent with effectuating the underlying purposes of the Bankruptcy Code, exceptions to discharge under § 523 are to be narrowly construed. *See Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992). Notwithstanding the weighty burden, in order to prevail, a creditor need only establish the elements of nondischargeability under 11 U.S.C. § 523, by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. at 287-88.

**I.      Whether the Blixseths have standing to bring the pending § 523(a)(4) claim**.

Before any federal court exercises jurisdiction over a matter, the court must determine whether the plaintiff has standing. "Standing is a 'threshold question in every federal case, determining the power of the court to entertain the suit.'" *In re Veal*, 450 B.R. 897, 906 (9th Cir. BAP 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Constitutional standing requires injury in fact, causation, and redressability. In addition to constitutional standing, as one aspect of the judicially self-imposed prudential limitations on the

16

exercise of federal court jurisdiction, plaintiffs must also demonstrate they have prudential

standing.  *Id.*

       As recognized in *Veal*, the requirements for constitutional standing are minimal.  *Id*.

Like the appellees in *Veal*, the larger hurdle for the Blixseths is the "doctrine that a plaintiff must

assert its own legal rights and may not assert the legal rights of others.  *Id*. at 907 (citing *Sprint

Commc'ns Co., LP v. APCC Servs., Inc*., 554 U.S. 269, 289 (2008)).  As explained in *Veal*,

> This formulation of the prudential standing doctrine, however, conflates
> somewhat with the real party in interest doctrine found in Rule 7017.  While at
> least one prominent authority maintains that the third party standing doctrine and
> the real party in interest requirement are legally distinct, 6A Charles Alan Wright,
> Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE, Civil §
> 1542 (3d ed. 2010), another authority succinctly summarizes the practical
> distinction: "Generally, real parties in interest have standing, but not every party
> who meets the standing requirements is a real party in interest." 4 MOORE'S
> FEDERAL PRACTICE § 17.10[1], at p. 17–15 (3d ed. 2010) (footnotes omitted).

* * *

> Civil Rule 17(a)(1) starts simply: "An action must be prosecuted in the
> name of the real party in interest." Although the exact definition of a real party in
> interest may defy articulation, its function and purpose are well understood. As
> stated in the Advisory Committee Notes for Civil Rule 17,

>> In its origin the rule concerning the real party in interest was permissive in
>> purpose: it was designed to allow an assignee to sue in his own name. That
>> having been accomplished, the modern function of the rule in its negative
>> aspect is simply to protect the defendant against a subsequent action by the
>> party actually entitled to recover, and to insure generally that the judgment
>> will have its proper effect as res judicata.

> Notes of Advisory Committee on 1966 Amendments to Rule *17. See also U–Haul
> Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1039 (9th Cir.1986) (" 'The modern
> function of the rule ... is simply to protect the defendant against a subsequent
> action by the party actually entitled to recover, and to insure generally that the
> judgment will have its proper effect as res judicata.' ") (quoting Advisory
> Committee Notes to the 1966 amendment of Civil Rule 17).

> In this regard, most real party in interest inquiries focus on whether the

17

> plaintiff or movant holds the rights he or she seeks to redress. *See* MOORE'S, *supra*, § 17.10[1]. Was, for example, the plaintiff a party to the contract sought to be enforced? Did it have some other interest in the contract?

*Id.* 907-08.

The Blixseths' claim is brought pursuant to § 523(a)(4) of the Bankruptcy Code. The Blixseths argue Edra used BFI assets as security for what was essentially a personal loan. To challenge the dischargeability of a debt under § 523(a)(4), "the creditor to whom such debt is owed" must request the bankruptcy court to except the debt from discharge. 11 U.S.C. § 523(c)(1). Standing to bring a dischargeability action calls for a "creditor" holding a "debt" or "claim" that "is owed" to that "creditor." The Bankruptcy Code defines "creditor" as an "entity that has a claim against the debtor." Central to the standing requirement of § 523(c) is a "debt" and its counterpart, a "claim." The definition of "creditor" found in 11 U.S.C. § 101(10)—"entity that has a claim against the debtor"—requires that the entity possess some bankruptcy claim, not that it be owed money.

> "Claim" is broadly defined as meaning either a "right to payment ... or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(5). "Right to payment" means "nothing more nor less than an enforceable obligation." *Johnson v. Home State Bank*, 501 U.S. 78, 83, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991) (quoting *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 558, 563–64, 110 S.Ct. 2126, 2133–34, 109 L.Ed.2d 588 (1990)); *In re Irizarry*, 171 B.R. 874, 878 (9th Cir. BAP 1994). "Absent an overriding federal interest, the existence of a claim in bankruptcy is generally determined by state law." *In re Hassanally*, 208 B.R. 46, 49 (9th Cir. BAP 1997) citing *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979).

*In re Cross*, 218 B.R. 76, 78 (9th Cir. BAP 1998). On the other hand, "creditor to whom such debt is owed" means literally that the creditor is owed money by the debtor, and that the creditor holds a claim in its own behalf or in its own right. The Blixseths hold no claims against Edra in

their own right, which is evidenced by the fact that only BFI, and not the Blixseths, filed a proof of claim in Edra's bankruptcy case.

Furthermore, as mentioned above, the Blixseths contend Edra used assets belonging to BFI to secure her personal loan. The alleged injury suffered was to BFI as an entity, and not to the Blixseths directly. The Blixseths suffered a loss, if any, only indirectly as members of BFI.

While the Blixseths' claim is brought under § 523(a)(4), the substantive law implicated is Montana's law governing limited liability companies. As the Court will discuss later, Montana law imposes an unqualified duty on members of limited liability companies ("LLC"), who hold company property, to act as a trustee. *See* MONT. CODE ANN. ("MCA") § 35-8-310(2)(a). Montana law further provides:

> (1) A member of a limited liability company may maintain an action in the right of the company if the members or managers having authority to bring the action have refused to commence the action or an effort to cause those members or managers to commence the action is not likely to succeed.

MCA § 35-8-1104.

A bankruptcy court in Florida recently held that members of an LLC lack standing to claim an exception to discharge of the company manager under § 523 for losses suffered as members of the company. *In re Whittle*, 449 B.R. 427, 429-430 (Bankr. M.D.Fla. 2011). The court in *Whittle* held that LLC members were not "creditors to whom a debt is owed," *id*. at 429, and that "[t]he Florida statutory scheme is clear that a limited liability company holds property separate and apart from the property of its members[.]" *Id*. at 430. In an unpublished decision construing Texas law, the Ninth Circuit also determined that members of an LLC must bring a derivative rather individual claim: "Thus, in order for Appellants to bring a claim based on injuries allegedly suffered by [the LLC], the suit must be brought derivatively." *Albers v.*

19

*Guthy-Renker Corp.,* 92 Fed.Appx. 497, (9th Cir. 2004).

As in other states, an LLC in Montana is a separate entity: "A limited liability company is not merely an informal business association. It is a legal entity, distinct from its members, formed by signing and filing articles of organization with the secretary of state. Its obligations are separate from its members." *Ioerger v. Reiner*, 2005 MT 155, ¶ 20, 327 Mont. 424, 114 P.3d 1028, 1032. Furthermore, the Montana Supreme Court has held that limited partners cannot bring an individual claim when a derivative claim is the appropriate remedy. *Larson v. First Interstate Bank of Kalispell* (Mont. 1990), 786 P.2d 1176, 1179.

Like in *Larson*, the Blixseths' claim is based solely on their membership in BFI. Taken together, the cases discussed above indicate that Montana prohibits individual actions to be brought in place of a derivative action. Under such circumstances, a derivative claim is not only appropriate, but required.

With respect to derivative standing, Edra's counsel argues in his Post-Trial Memorandum that the Blixseths lack standing to sue Edra under MCA § 35-1-543 because the Blixseths failed to show they made written demand upon BFI to bring suit against Edra. MCA § 35-1-543 pertains to corporations, partnerships and associations. BFI was and is a limited liability company. Derivative standing of LLCs is governed specifically by MCA. § 35-8-1104. Montana's Limited Liability Company Act clearly authorizes derivative claims brought by members on behalf of LLCs.

Procedurally, Montana law requires the Blixseths to show that the members or managers having authority to bring the action have refused to commence the action or that an effort to cause those members or managers to commence the action is not likely to succeed. Beau was the

20

manager of BFI for a period of two months and did not file a complaint against Edra on behalf of BFI. The Court can appreciate that Beau's short tenure did not allow him adequate time or experience to take action on behalf of BFI against Edra. However, the Blixseths failed to show that the subsequent managers, such as Joseph Womack, either refused to commence a dischargeability action against Edra or that such an effort would be futile.

Moreover, MCA 35-8-1104(3) provides: "In a derivative action for a limited liability company, the complaint must set forth with particularity the effort of the plaintiff to secure initiation of the action by a member or manager or the reasons for not making the effort." In some instances, the Court may infer the basis for the belief a manager would not be likely to bring a derivative suit. *Larson*, 786 P.2d at 1181. However, the Blixseths offered no evidence to support the conclusion that the managers of BFI would refuse to bring a derivative suit. Absent such a showing, the Blixseths lack standing to bring a derivative suit.

This Court concludes that the Blixseths lack standing to pursue their § 523(a)(4) claim. However, even if the Blixseths had standing, which they do not, their claim under § 523(a)(4) would nevertheless fail.

## II.     11 U.S.C. § 523(a)(4) – Fiduciary Capacity

Section 523(a)(4) provides that a "discharge under section 727 . . . does not discharge an individual from any debt– . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." To prevail on their § 523(a)(4) claim, the Blixseths are required to establish (1) that Edra was acting in a fiduciary capacity, and (2) that Edra committed a "defalcation" in that capacity.

As to the first element, the broad, general definition of "fiduciary" under nonbankruptcy

21

law is inapplicable in the bankruptcy context.  *Cal-Micro, Inc. v. Cantrell (In re Cantrell)*, 329

F.3d 1119, 1125 (9th Cir. 2003); *In re Honkanen*, 446 B.R. 373, 378 (9th Cir. BAP 2011).  To fall

within the narrow definition of "fiduciary" under § 523(a)(4), "the fiduciary relationship must be

one arising from an express or technical trust that was imposed before, and without reference to,

the wrongdoing that caused the debt as opposed to a trust *ex maleficio*, constructively imposed

because of the act of wrongdoing from which the debt arose."  *Id*. (citations omitted).

The scope of the term "fiduciary capacity" under § 523(a)(4) is a question of federal law.

*See Mills v. Gergely (In re Gergely)*, 110 F.3d 1448, 1450 (9th Cir. 1997).  The Ninth Circuit has

adopted a narrow definition of "fiduciary" for purposes of § 523(a)(4), requiring that the fiduciary

relationship arise from an express or technical trust that was imposed prior to the wrongdoing that

caused the debt.  *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996).  Similarly, in

*Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934), the

Supreme Court instructed that the term "fiduciary capacity" is narrower here than it is in some

other contexts:  section 523(a)(4) covers only "express" or "technical trusts" and not trusts

arising out of "the very act of wrongdoing."  *See also, In re Cantrell*, 329 F.3d at 1125 ("The

broad, general definition of fiduciary—a relationship involving confidence, trust and good

faith—is inapplicable in the dischargeability context.... The fiduciary relationship must be one

arising from an express or technical trust that was imposed before and without reference to the

wrongdoing that caused the debt.")

Although the definition of fiduciary is governed by federal law, the Ninth Circuit has relied

in part on state law to ascertain whether the requisite trust relationship exists.  *Cantrell*, 329 F.3d at

1125; *In re Lewis*, 97 F.3d at 1185.  To establish the trust relationship required by § 523(a)(4), "the

22

applicable state law must clearly define fiduciary duties and identify trust property." *Honkanen*, 446 B.R. at 379 (citing *Runnion v. Pedrazzini (In re Pedrazzini)*, 644 F.2d 756, 759 (9th Cir. 1981)).  "The mere fact that state law puts two parties in a fiduciary-like relationship does not necessarily mean it is a fiduciary relationship within 11 U.S.C. § 523(a)(4)." *Id.*  However, establishing an express trust in Montana is straightforward and requires four elements: (1) intent to create a trust; (2) the existence of trust property; (3) designation of beneficiaries; and (4) compliance with the statute of frauds.  MCA §§ 72-33-202, 203, 206, 208.

The Blixseths assert that Edra was a fiduciary of BFI and its members based on  MCA § 35-8-310 which provides:

> (1) The only fiduciary duties that a member owes to a member-managed company and the other members are the duty of loyalty imposed by subsection (2) and the duty of care imposed by subsection (3).
>
> (2) A member's duty of loyalty to a member-managed company and its other members is limited to the following:
>
>> (a) to account to the company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or derived from a use by the member of the company's property, including the appropriation of a company's opportunity;
>>
>> (b) to refrain from dealing with the company in the conduct or winding up of the company's business on behalf of a party or as a person having an interest adverse to the company; and
>>
>> (c) to refrain from competing with the company in the conduct of the company's business before the dissolution of the company.
>
> (3) A member's duty of care to a member-managed company and the other members in the conduct of and winding up of the company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

Under MCA § 35-8-310 (2)(a), Montana law imposes an unqualified duty on members of

23

an LLC who hold company property to act as a trustee.  The statute (1) defines the trust res: "any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or derived from a use by the member of the company's property;" (2) spells out the trustee's fiduciary duties: "account to the company and to hold as trustee for it;" and (3) imposes a trust on the funds prior to the act which created the debt: the obligation arises with membership in the LLC and does not depend on any subsequent conduct.  Therefore, Montana law creates an express trust, recognized by federal law for purposes of § 523(a)(4).

MCA § 35-8-310 (2)(a) stands in contrast to the statutes recently considered by the Bankruptcy Court in Idaho which found no fiduciary duty among members of an LLC.  *In re Woodman*, 451 B.R. 31 (Bankr. D. Idaho, 2011).  Idaho law provides:

> Every member and manager must account to the limited liability company and hold as trustee for it any profit or benefit derived by that person *without the consent* of more than one-half ( ½) by number of the disinterested managers or members, or other persons participating in the management of the business or affairs of the limited liability company, from:
>
> > (a) Any transaction connected with the conduct or winding up of the limited liability company; or
> >
> > (b) Any use by the member or manager of its property, including, but not limited to, confidential or proprietary information of the limited liability company or other matters entrusted to the person as a result of his status as manager or member.

Idaho Code § 53–622(2) (2009) (emphasis added).

The *Woodman* court cited *Ragsdale v. Haller*, 780 F.2d 794 (9th Cir. 1986) stating:

> The Ninth Circuit considered language similar to that contained in Idaho Code § 53–622(2) in *Ragsdale,* a case in which the court was tasked with determining whether, under California law, partners acted in a fiduciary capacity toward each other for purposes of § 523(a)(4). 780 F.2d at 795–97. The provision at issue there, Cal. Corp.Code § 15021 (1977), provided:
>
> > Every partner must account *to the partnership* for any benefit, *and hold as trustee*

24

>*for it* any profits derived by him without the consent of the other partners from
>any transaction connected with the formation, conduct, or liquidation of the
>partnership or from any use by him of its property.
>
>*Id.* at 796 (emphasis added). *Ragsdale* concluded that the California code provision did
>not establish the fiduciary relationship required by § 523(a)(4), noting that the statute
>created a trust only when a partner derived profits without consent of the partnership; just
>the sort of trust *ex maleficio* that courts, including the United States Supreme Court, had
>found to be outside the purview of § 523(a)(4). *Id.* (citing *Davis v. Aetna Acceptance
>Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Teichman*, 774 F.2d at 1399)).

*In re Woodman*, 451 B.R. at 39-40.

Both *Woodman* and *Ragsdale* contemplate a statute in which the trust arises only when

the LLC member acts without consent. Such a statute creates a trust *ex maleficio*. By contrast,

MCA § 35-8-310 contains no similar qualification on the imposition of the trustee relationship.

This difference is sufficient to distinguish MCA § 35-8-310 from the statutes in *Woodman* and

*Ragsdale*.

A Washington court recently analyzed a statute similar to MCA § 35-8-310 and

concluded Washington law imposed an express trust for purposes of § 523(a)(4):

>Washington case law is in line with the relevant statute, which provides that a
>partner "...hold[s] as trustee for [the partnership] any property, profit, or benefit
>derived by the partner in the conduct...of the partnership business..." RCW
>25.05.165(2)(a). If state law makes clear that a partner is a trustee over
>partnership assets for all purposes, then the partner is a fiduciary within the
>narrow meaning of §523(a)(4). *Id.* (citing *Ragsdale,* 780 F.2d at 796). Under
>Washington law, Appellant's status as a fiduciary within the meaning of
>§523(a)(4) is definitively established by statute and precedent, with the res of the
>trust being property that belongs to Auburn Ace Holdings. There is no reason to
>regard the trust at issue as a constructive, resulting, or implied trust. Therefore,
>wrongs incurred in breach of a fiduciary duty owed by a partner to his co-partners
>can properly give rise to a non-dischargeable debt under §523(a)(4). *Id.*

*In re Errez*, (slip copy) 2010 WL 5185399, *2 (W.D. Wash. 2010).

As to the second element of § 523(a)(4), "[d]efalcation is defined as the 'misappropriation

25

of trust funds or money held in any fiduciary capacity; [the] failure to account for such funds.'" *In re Bigelow*, 271 B.R. 178, 186 (9th Cir. BAP 2001), quoting *Lewis v. Scott*, 97 F.3d 1182, 1186 (9th Cir. 1996).

As discussed above, Montana state law creates an express trust relationship between members of an LLC who hold company property and the members of the LLC. Edra exercised control of company assets in pledging them as collateral to First Bank. In doing so, she made herself trustee of those assets and assumed a fiduciary duty within the meaning of § 523(a)(4).

The Blixseths claim that Edra breached her fiduciary duty because she lacked authority under the Operating Agreement to pledge BFI assets to secure a personal loan. The basis of this claim is their assertion that "Section 6.5 of the Operating Agreement provides that in cases of self-dealing, the transaction must be ratified by the non-self-interested members." *See* the Blixseths' Post-Trial Memorandum at docket entry no. 116, p.11. To the contrary, ¶ 6.5 of the Operating Agreement provides:

> **Self Interest**. A member does not violate any duty or obligation to the Company merely as a result of engaging in conduct that furthers the interest of the Member. A member may lend money or transact other business with the Company, and, in this case, the rights and obligations of the Member will be the same as those of a person who is not a Member, so long as the loan or other transaction has been approved or ratified by the Manager, or by the Members if the loan or other transaction involves a Manager. *Unless otherwise provided by applicable law, a member with a financial interest in the outcome of a particular action is nevertheless entitled to vote on such action.*

Exhibit 101 (emphasis added). The Restated and Revised Operating Agreement for BFI specifically allows members to obtain approval for financial deals with BFI and permits interested parties to vote on those matters. The Blixseths do not raise any applicable law that would override the clear language of the Operating Agreement. Edra obtained approval of

26

members representing an 80% ownership interest in BFI.

The Blixseths also contend that the loans did not benefit BFI as an independent ground to find Edra committed defalcation. They rely on *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366, 389 (Bankr. E.D.Tex. 2009), for the proposition that the failure to properly secure loans for personal gain is a defalcation. However, *Harwood* is distinguishable. The debtor in *Harwood* was a "sophisticated banker" who owned a 50% interest in a subchapter S corporation, B & W Finance Co. The subchapter S corporation was the sole general partner and owned a 51% partnership interest in a limited partnership, FNFS. The debtor in *Harwood* served as president, chief operating officer, and a director of the subchapter S corporation, which in turn provided executive and managerial support to FNFS and which, pursuant to FNFS's partnership agreement, exercised "full, sole, exclusive, and complete discretion in the management and control of the business, operations, and affairs of [FNFS]." The debtor began taking loans from FNFS, which loans were memorialized in two promissory notes to FNFS—a $700,000 Master Note accompanied by a deed of trust in favor of FNFS, and a $125,000 note secured by a second-lien deed of trust in favor of FNFS on a residential rental property. The debtor prepared and signed the Notes and security documents, which he kept in a personal "loan file" in a desk drawer in his office. He never filed the deeds of trust with the county clerk. The board of directors of the subchapter S corporation later learned that the debtor had failed to record the deeds of trust that he had executed in favor of FNFS as security for the two notes, leaving the partnership with an unperfected interest in the pledged collateral. The board of directors also learned after the fact that the debtor had subsequently pledged the property, which was supposed to serve as security for one of the notes, as collateral for two other promissory notes to a bank.

27

The bankruptcy court found that the debtor in *Harwood* "absolutely knew or had reason to know" of the detrimental effect that failure to secure the loans would have. *Id*. at 399. Additionally, the debtor in *Harwood* borrowed cash directly from the company rather than pledging uncertain future payments as collateral, failed to follow established procedure for obtaining his loans and continued to borrow money without any apparent intention or ability to repay the loans. *Id.* at 379-80. Finally, and most importantly, the debtor in *Harwood* appears to have conspired to mislead the board of directors into believing that the loans were collateralized when they were not. *Id.* at 380-381.

By contrast, Edra had authority from members holding an 80% ownership interest in BFI to borrow the funds, did not misrepresent the lack of securitization, and planned to repay the loans out of the same funds that were pledged as collateral (meaning that her ability to repay was tied to the value of the Company's original asset.) Edra offered a promissory note and interest on the loans she took, and BFI's members accepted this as a legitimate investment. In retrospect, Edra's promissory note to BFI was no less valuable to BFI than the S. P. Realty note. Although Edra owed a fiduciary duty to the Blixseths with regard to BFI property, they have failed to establish that she breached that duty.

### III.    Damages.

Furthermore and more importantly, the Court is not persuaded the Blixseths suffered any damage as a result of Edra's actions. In order to maintain a cause of action, the Blixseths bear the burden of establishing they suffered damages as a result of Edra's alleged defalcation. In determining whether damages are speculative, this circuit has "'distinguished uncertain damage, which prevent[s] recovery, from an uncertain extent of damage, which [does] not prevent

28

recovery[.]'" *Allen v. United Food & Commercial Workers Int'l. Union*, 43 F.3d 424, 427–28

(9th Cir.1994) (quoting *In re Multidistrict Vehicle Air Pollution,* 591 F.2d 68, 73 (9th Cir.1979),

*cert. denied*, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979)).  *See also*, *PM Factors, Inc. v.*

*Kreisel (In re Kreisel)*, 399 B.R. 679, 690 (Bankr. C.D.Cal. 2008).

      The Blixseths have failed to establish the existence of any damages.  Not a single shred of

evidence was presented to establish the Blixseths and BFI would be better off had BFI not

pledged the S.P. Realty note as collateral.  At a minimum, the Blixseths were required to show

that the S.P. Realty note had value because absent some value, the Blixseths cannot sustain their

burden of proving damages.  S.P. Realty has not made a payment on the Promissory Note since

January 14, 2008, and has advised the parties in this proceeding that the membership agreements,

if they in fact exist, are worth nothing and if BFI or its members attempt to foreclose, S.P. Realty

will simply file bankruptcy.  The evidence presented in this case strongly suggests that the S.P.

Realty note is, in all likelihood, worthless.

      The Blixseths theory of damages does not merely lack precision, it is entirely speculative.

The Blixseths indirectly admit as much by arguing in their post-trial memorandum that " each of

Plaintiffs' interests are now worth, at most, $1.4 million – a reduction of $1.1 million each."

The foregoing statement does not prove damages.  In other words, the Blixseths have failed to

establish that their claimed damage figure of $1 million is remotely plausible.  This Court cannot

issue judgments based upon purely theoretical figures.  Unfortunately for the Blixseths, they

failed to establish their actual damages as their burden of proof requires.  Since the Blixseths

have failed to show the existence of damages with reasonable certainty, there is no need to

determine how damages might be affected by pending or future litigation in other courts.

## IV.    Conclusion

The Blixseths attempt to seek an exception to discharge fails on multiple grounds.  First, the Blixseths have not met the procedural requirements to bring a derivative action claim, nor can they bring the pending claim on their own behalf.  Thus, they lack standing before this Court.  Second, Edra complied with the Operating Agreement and did not commit a defalcation by causing BFI to obtain a loan from First Bank secured by the S.P. Realty note.  Finally, the Blixseths have failed to show they suffered any damages as a result of Edra causing BFI to pledge the S.P. Realty note as security to First Bank.  Any one of these issues is sufficient to deny the Blixseths claim.

In accordance with the foregoing,

IT IS ORDERED that the Court will enter a separate judgment in favor of the Debtor/Defendant Edra Blixseth and against the Plaintiffs Beau and Morgan Blixseth; and the Plaintiffs' complaint against the Defendant is dismissed with prejudice.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana